UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

PRECIOUS STEPHENS,

                       Plaintiff,

                                                 **MEMORANDUM & ORDER**

       -against-                                      07-CV-596 (PKC)

1199 SEIU, AFL-CIO & BAYVIEW NURSING
AND REHABILITATION CENTER,

                       Defendants.

-----------------------------------------------------------------x

PAMELA K. CHEN, United States District Judge:

      Plaintiff Precious Stephens ("Stephens") asserts "hybrid" claims of breach of contract pursuant to § 301 of the Labor Management Relations Act ("§ 301"), 29 U.S.C. § 185, and breach of the implied duty of fair representation ("DFR") pursuant to the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* ("hybrid § 301/DFR claims"). *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164-65 & n.14 (1983) (Brennan, J.) (describing the recognition of hybrid § 301/DFR claims by *Vaca v. Sipes*, 386 U.S. 171 (1967) (White, J.), and *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554 (1976) (White, J.)).[1] These claims are based on the requisite

---

[1] *See also United Parcel Serv., Inc. v. Mitchell* ("*Mitchell*"), 451 U.S. 56, 66-67 & n.2 (1981) (Stewart, J., concurring) (same). The *raison d'être* of hybrid § 301/DFR claims is: where, as here, the plaintiff's failure to pursue arbitration would preclude her ability to bring a standalone § 301 claim against her employer in court, the plaintiff may still bring a *hybrid* claim based on the fact that her union had "sole power" over the arbitration and grievance process and that the union's "wrongful refusal" to arbitrate in breach of its DFR barred her from otherwise asserting a claim that the employer breached an agreement in violation of § 301. *Vaca*, 386 U.S. at 184-86; *see also DelCostello*, 462 U.S. at 163-64 (noting that hybrid § 301/DFR claims correct the "unacceptable injustice" created by the rule that the plaintiff must "exhaust any grievance or arbitration remedies" before suing her employer under § 301, "when the union representing [the

allegations that (i) Stephens's former employer, Defendant Bayview Nursing and Rehabilitation Center (the "Employer"), breached a collective bargaining agreement and settlement agreement as to Stephens; and (ii) Defendant 1199 SEIU, AFL-CIO (the "Union"), on behalf of Stephens as a Union member, declined to arbitrate the Employer's breaches, thereby breaching the Union's DFR. (Dkt. No. 1-3 ("Compl.") ¶¶ 4-11.)[2] Defendants now seek summary judgment dismissing these claims against them. (Dkt. No. 95; Dkt. No. 97.) For the reasons set forth below, Defendants' summary judgment motions are granted.

I. Background[3]

   A. *The Termination Decision*

Stephens began working for the Employer, a nursing home, as a certified nursing assistant on July 2, 2005. (Union 56.1 ¶ 1.) The Employer, however, initially decided to

---

plaintiff] in the grievance/arbitration procedure acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation"). In short, the union's breach of its DFR "removes the bar" to the § 301 claim against the employer. *Hines*, 424 U.S. at 567.

[2] The background of this case is set forth in the prior decision of Judge Joseph F. Bianco. *Stephens v. Bayview Nursing & Rehab. Ctr.*, No. 07-CV-596, 2008 WL 728896, at *1-2 (E.D.N.Y. Mar. 17, 2008).

[3] The Court construes any disputed facts in the light most favorable to Stephens, as the non-moving party, for purposes of Defendants' summary judgment motions. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970) (Harlan, J.). However, where Stephens either (i) admits or (ii) denies without citing to admissible evidence certain of the facts asserted in the Union's and/or the Employer's Local Rule 56.1 Statement (Dkt. No. 97-3 ("Union 56.1"); Dkt. No. 95-1 ("Employer 56.1")), the Court may deem any such facts undisputed. *See* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1(c)-(d); *see also Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002) (Sotomayor, J.) ("Fed. R. Civ. P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") (collecting cases). Standalone citations to "Union 56.1" and/or "Employer 56.1" denote that the Court has deemed certain of Defendants' asserted facts undisputed, and also incorporate by reference any documents cited therein. Where relevant, however, the Court may cite directly to such documents.

terminate Stephens's employment on June 26, 2006, in an alleged breach of its collective bargaining agreement with the Union, of which Stephens was a member. (*Id.*; Employer 56.1 ¶ 10; Compl. ¶ 4.)[4] Pursuant to the collective bargaining agreement, the Union commenced the grievance process over the Employer's termination decision. (Union 56.1 ¶ 2.)

On June 29, 2006, three days after the termination decision, Stephens—along with the Union's Vice President, Joanne McCarthy ("McCarthy"), and its Organizer, Jennie Stallings ("Stallings") (collectively, the "Union representatives")—met with the Employer's representative, Frank Iannucci ("Iannucci"), for 35-40 minutes, as part of "step two" in the grievance process, to argue for Stephens's reinstatement. (*Id.* ¶ 3; Employer 56.1 ¶ 12; Dkt. No. 97-1 ("Union Exs."), Ex. C, at 52:5-52:13.) McCarthy testified that she and Stallings met with Stephens immediately prior to the meeting to obtain her version of the events that precipitated the termination decision. (Union Ex. C, at 52:14-52:18.)[5] During the meeting, Iannucci nonetheless explained that the Employer would not be reinstating Stephens's employment. (*Id.* at 53:9-53:20; Union Ex. B, at 65:20-65:25.) McCarthy did not take notes of the meeting, as she did at most other meetings. (Union Ex. C, at 56:11-56:24; Stephens Ex. 10, at 31:25-32:3.)

After the preliminary meeting with Iannucci, McCarthy and Stallings privately advised Stephens that her case could not be arbitrated, because it would not succeed, and that one

---

[4] The alleged events that precipitated the Employer's termination decision are disputed (Employer 56.1 ¶¶ 13-16; Dkt. No. 92 ("Stephens Opp. to Employer 56.1") ¶¶ 13-16), but they are not necessary to the Court's resolution of the summary judgment motions. *See infra* Section II.B. The *final* infraction was Stephens's repeated refusal when asked to care for two of the residents in the nursing home, though Stephens disputes that she "did carry out the order as directed by her superior before she left." (Employer 56.1 ¶ 16; Stephens Opp. to Employer 56.1 ¶ 16.)

[5] Stephens, however, testified that she did "[n]ot really" have a "good conversation" with McCarthy and Stallings on the day of the meeting, but did not deny that such a meeting had occurred. (Dkt. Nos. 94-1–94-11 ("Stephens Exs."), Ex. 9, at 306:19-307:23 (admitting that "I had a conversation with [Stallings]," and "I told her what had happened").)

3

remaining option was to settle with the Employer which, in lieu of termination, would accept her resignation. (Union 56.1 ¶ 5.) Stephens testified as much at her deposition:

> Q. Let me ask you a question then: Did you speak with Jennie Stallings and/or Joanne McCarthy about taking your case to arbitration?
>
> A. Yes, sir.
>
> *   *   *
>
> A. At the same time we did the settlement agreement, *I went to Ms. Jennie Stallings and said I want to go to arbitration* because [the Employer] refused to take me back. Let the administration judge decide.
>
> Q. What did she say to you?
>
> A. *She said no[.]*
>
> *   *   *
>
> Q. So you had a discussion about the merits of your case, correct?
>
> A. Yes.
>
> Q. And . . . did the union tell . . . you that your case would not be successful?
>
> A. *Jennie Stallings told me it would not be successful because the charge nurse, or the nurse on the floor gave a damaging statement in her testimony, that I was faulted, and we wouldn't win arbitration.*

(Stephens Ex. 9, at 302:21-304:23 (emphasis added); *see also* Union Ex. C, at 54:6-54:8 ("[Stephens] was advised that this was not a good case to go to arbitration. We could do a settlement agreement.").)

That same day, Stephens and the Union representatives came back to the bargaining table with Iannucci to propose a settlement agreement, which the parties signed. (Stephens Ex. 4.) The settlement agreement provided that the Employer would (i) "accept a letter of resignation from Precious Stephens,"[6] (ii) "not . . . actively fight an unemployment application by Precious

---

[6] Stephens's resignation letter is reproduced at Stephens Ex. 5.

Stephens," and (iii) "remove the grievant termination from [Stephens's] employee file," and only "give a 'neutral letter of reference'" for Stephens. (*Id.*) Stephens, in signing the settlement agreement, acknowledged that "she signs it of her own free will and . . . *the Union has fully and fairly represented her in this matter*." (*Id.* (emphasis added).)

### B. Opposition to Unemployment Insurance Benefits

Upon resigning, Stephens filed a claim for unemployment insurance benefits. (Union 56.1 ¶ 7.) The New York State Department of Labor initially determined that Stephens was not entitled to such benefits. (Dkt. Nos. 96–96-2 ("Employer Exs."), Ex. CC, at 115:20-116:2; *see also* Employer Ex. I (referencing the Department of Labor's "initial determinations disqualifying [Stephens] from receiving [unemployment insurance] benefits, effective June 27, 2006").) The administrative law judge (the "ALJ") scheduled a formal hearing for August 30, 2006. (Stephens Ex. 7 ("Hearing scheduled for: August 30, 2006 – 11:30 A.M."); *see also* Employer Ex. J (requesting "transcript of the August 30, 2006 hearing"); Compl. ¶ 6 (citing the August 30, 2006 hearing).)

In advance of the August 30, 2006 hearing before the ALJ, Budget Services, Inc. ("Budget"), as the Employer's payroll administrator and purported agent, opposed Stephens's benefits claim. (Union 56.1 ¶ 8.) The Employer submitted several statements to support Budget's opposition, including a July 31, 2006 statement by Iannucci that Stephens's refusal to care for residents of the nursing home was "grounds for termination," but that "[Iannucci] just wanted her to resign and go away." (Stephens Ex. 6.)

Stephens learned for the first time of Budget's—and, by extension, the Employer's— opposition to her benefits claim at the August 30, 2006 hearing before the ALJ. (Employer Ex. CC, at 124:16-124:20.) However, immediately after the hearing, the ALJ overruled the Department of Labor's initial determination, and retroactively awarded unemployment insurance

5

benefits to Stephens, as of June 27, 2006, *i.e.*, the date of the Employer's termination decision. (Employer Ex. I.) Budget appealed the ALJ's ruling on September 11, 2006. (Employer Ex. L.)

Sometime after the hearing and ruling by the ALJ, Stephens contacted McCarthy to report that the Employer had allegedly breached the settlement agreement by "fighting" Stephens's benefits claim, and to request arbitration. (Union Ex. B, at 127:15-129:10; Compl. ¶¶ 7, 9; *see also* Stephens Ex. 9, at 357:18-358:20 (same).) McCarthy subsequently contacted Iannucci to inquire as to "why [the Employer] would have blocked [Stephens's] unemployment or appealed her application *when we had an agreement*." (Union Ex. C, at 65:2-65:4 (emphasis added).) Although Iannucci disavowed that the appeal of the ALJ's ruling was the Employer's decision, he agreed to "immediately take[] care of" this issue and ask that Budget "withdraw their appeal." (*Id.* at 65:19-66:5.) Accordingly, on September 21, 2006, less than two weeks after noticing the appeal, Budget wrote to "withdraw" it. (Employer Ex. J; *see also* Employer Ex. K (facsimile from Iannucci to McCarthy, forwarding Budget's notice of withdrawal).) The appeal board, thus, withdrew the appeal. (Employer Ex. L.)

McCarthy testified that (i) due to the withdrawal of the appeal, she determined that "there was nothing to arbitrate based on the fact that [Stephens] received her money, that's what an arbitrator would rule"; and (ii) the "reason . . . that I didn't arbitrate" was *because* Stephens received benefits retroactively to the date of the termination decision. (Union Ex. C, at 82:19-82:21, 116:7-116:10.)

6

*C. Interference with Job Referrals*

On or about July 11, 2006, Stephens turned to the 1199SEIU/Health & Human Services Employment Center (the "Employment Center")[7] for assistance in obtaining much-needed job referrals. (Dkt. No. 91 ("Stephens Opp. to Union 56.1") ¶ 14.) As requested, in obtaining the Employment Center's assistance, Stephens (i) completed an application for employment and requests for verification of employment, in which Stephens listed May 2002 and July 2004 as her dates of employment with a former employer, Peninsula Hospital (Employer Ex. N; Employer Ex. R); (ii) took another nursing assistant exam on which Stephens received a score of 60 percent (Employer Ex. P), even though her license as a certified nursing assistant had not expired; and (iii) interviewed with Michael Labrise ("Labrise"), the lead job service coordinator for the Employment Center, at which time Stephens claimed to have "[q]uit" from the Employer (Employer Ex. Q). (Employer 56.1 ¶¶ 24-25; Stephens Opp. to Employer 56.1 ¶ 24.) Stephens also signed an acknowledgement of an applicant's responsibilities form, which stated, among other things, that "*[i]f you lie on any part of the application or about your credentials you will no longer be eligible for the Employment Center.*" (Employer Ex. O (emphasis added); Employer 56.1 ¶ 24.)

On October 20, 2006, the Employment Center informed Stephens that it would not be assisting her with job referrals. (Employer Ex. U.) Contrary to Stephens's claim during the interview with the Employment Center that she had "[q]uit" her position with the Employer, the Employer responded to the verification request by designating Stephens as having been

---

[7]   The Employment Center provides assistance to discharged Union members (and non-Union members) seeking to work for Union-affiliated institutions, but it operates as a separate entity, independent of the Union, even with respect to its decisions on job referrals. (Union 56.1 ¶¶ 15-16; Employer 56.1 ¶ 23; Employer Ex. BB, at 7:4-8:17, 62:24-63:10.)

"[t]erminated." (Employer Ex. S.)[8] Labrise conceded during his deposition that this discrepancy was the "major factor" in the Employment Center's refusal to refer Stephens. (Employer Ex. BB, at 42:13-45:5.) However, Labrise also pointed to two *other* "disqualifying factors" that the Employment Center considered, *i.e.*, (i) Peninsula Hospital's response to the verification request, which indicated that Stephens had started working at the hospital in November 2002, and not May 2002 as she reported;[9] and (ii) the fact that Stephens's score on the nursing assistant exam fell below the passing score of 72 percent. (Employer Ex. P; Employer Ex. R; Employer Ex. BB, at 37:8-37:17, 40:25-41:5, 55:11-55:25, 62:5-62:13, 64:3-64:11.)[10]

Around this time, Stephens again contacted McCarthy, reporting the Employer's negative reference to Stephens's termination as another alleged breach of the settlement agreement and requesting arbitration. (Union 56.1 ¶ 17; Stephens Ex. 9, at 379:3-379:11, 380:3-381:3; Compl. ¶ 8.) McCarthy then contacted Labrise, who told her that the Employment Center had refused to refer Stephens because "she was not forthcoming with her dates of employment at Peninsula

---

[8] Apart from the Employer's response to the verification request, there is no evidence of any other *non*-neutral employment references from the Employer. (*See* Stephens Ex. 9, at 149:6-149:15 (testifying only that "*one of*" the Employer's employment references, signed by "Beth Cohen," indicated that Stephens had been "terminated," instead of having a "neutral" tone) (emphasis added).) Indeed, the only letter of reference provided in the record states that "Mrs. Stephens has resigned from [the Employer] due to personal reasons." (Employer Ex. G.)

[9] Labrise testified that a discrepancy of several days in an applicant's dates of employment would be excused, even though the Employment Center typically considered "wrong dates of employment" as a sufficient "reason for disqualification." (Employer Ex. BB, at 27:10-28:23.) However, Labrise *also* testified that the discrepancy in this case, *i.e.*, between May and November, was a "long time" and would not have been excused. (*Id.* at 55:11-55:25.)

[10] On her employment application, and in her interview, Stephens admitted to having a prior 10-year felony drug conviction. (Employer Ex. N; Employer Ex. Q.) The fact of Stephens's prior conviction, however, did not appear to be one of the three stated reasons for the Employment Center's refusal to refer Stephens. (Employer Ex. BB, at 64:3-64:11.)

Hospital." (Union 56.1 ¶ 18; Union Ex. C, at 86:25-88:4; Employer Ex. AA, at 122:16-122:22.)[11]

McCarthy, accordingly, decided that arbitration would achieve "[n]othing," since the reason why Stephens "was not referred out" by the Employment Center was because of the discrepancy in her dates of employment with Peninsula Hospital, and not because of the Employer's negative reference to her termination from the nursing home. (Employer Ex. AA, at 122:12-125:10.)[12]

On January 19, 2007, Stephens filed the Complaint in state court. (Compl.) Defendants, however, removed this case to federal court. (Dkt. No. 1.) On March 17, 2008, Judge Bianco summarily denied Defendants' motions to dismiss, pending "further discovery." *Stephens*, 2008 WL 728896, at *4. Discovery was completed as of mid-2013. (Dkt. No. 82.) By January 23, 2014, the parties had fully briefed Defendants' summary judgment motions, now before the Court. (Dkt. No. 95; Dkt. No. 97.)

---

[11] Although Labrise had testified that the Employer's reference to termination was the "major factor" in not referring Stephens, *supra*, it is not relevant to what Labrise actually *told* McCarthy when she called him. (*See* Stephens Opp. to Union 56.1 ¶ 18 ("[A]dmit that McCarthy testified that Labrise told her that the erroneous dates were the reason Stephens was not assisted by the 1199 Employment Center.").) Indeed, according to McCarthy, Labrise did not otherwise indicate to her that the refusal to refer Stephens was, in part, due to the Employer's negative reference *or* Stephens's non-passing score on the nursing assistant exam. (Union Ex. C, at 87:16-88:18; Employer Ex. AA, at 122:3-122:11.)

[12] McCarthy also testified that she did not believe that the Employer's reference to Stephens's termination amounted to a breach of the settlement agreement. (Union Ex. C, at 93:14-94:12.) Even if McCarthy was *mistaken* in this belief, she nonetheless declined to arbitrate over the negative reference because she believed that it would not have changed the Employment Center's refusal to refer Stephens, given the discrepancy in her dates of employment with Peninsula Hospital which Labrise cited as a sufficient reason for the non-referral.

II. Discussion

*A. Legal Standard*

Where defendants seek to obtain summary judgment in their favor on a "claim" against them, they must establish that "there is no genuine dispute as to any material fact," and, thus, that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material" facts are legally-relevant ones, *i.e.*, facts that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (White J.).[13] "Genuine" disputes exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Disputes over facts that are "merely colorable" or "not significantly probative," or involving a "scintilla of evidence in support of [the non-moving party's] position" that establishes "some metaphysical doubt," are *not* deemed "genuine." *Id.* at 249, 252; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (Powell, J.).

Once the defendants have met their initial burden of showing the *absence* of genuine disputes as to the material facts relating to the subject claim, or any element thereof, the plaintiff must "do[] more than simply rely on the contrary allegation[s] in her complaint," and "go beyond the pleadings" to "designate specific facts showing that there *is* a genuine issue for trial." *Adickes*, 398 U.S. at 159-60; *Celotex*, 477 U.S. at 324 (emphasis added; quotations omitted); *see also Matsushita*, 475 U.S. at 587 (same); *Champion v. Artuz*, 76 F.3d 483, 485 (2d Cir. 1996) (per curiam) (same). Indeed, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that [her] version

---

[13] The defendants' ability to satisfy the summary judgment standard as to any "essential element" of a claim, for which the plaintiff would "bear the burden of proof at trial," "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (Rehnquist, J.).

of the events is not wholly fanciful." *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), *cert. denied*, 524 U.S. 911 (1998).

### B. Hybrid § 301/DFR Claims

Defendants move for the dismissal of Stephens's hybrid § 301/DFR claims, arguing, among other things, that the Union did not breach its DFR by declining to arbitrate purported breaches of the collective bargaining and settlement agreements, *i.e.*, the Employer's termination decision, opposition to unemployment insurance benefits, and interference with job referrals. (Dkt. No. 97-2 ("Union Br."), at 10-14; Dkt. No. 95-2 ("Employer Br."), at 12-14.)[14] The Court agrees that the absence of a triable issue regarding the "essential" DFR element is dispositive of these claims against Defendants. *Celotex*, 477 U.S. at 322-23.

The plaintiff's burden of establishing the elements for a hybrid § 301/DFR claim has been characterized by the Supreme Court as "substantial." *Hines*, 424 U.S. at 570. "To establish a hybrid § 301/DFR claim, a plaintiff must prove *both* (1) that the employer breached [an agreement] [*e.g.*, a collective bargaining or settlement agreement] and (2) that the union breached its duty of fair representation vis-a-vis the union members." *White v. White Rose Food*, 237 F.3d 174, 176-78 (2d Cir. 2001) (Sotomayor, J.) (emphasis added) (considering a hybrid § 301/DFR claim involving the employer's breach of a settlement agreement on behalf of the union members that it "laid off"); *see also DelCostello*, 462 U.S at 165 (quoting, for the same proposition, *Mitchell*, 451 U.S. at 66-67) (itself quoting *Hines*, 424 U.S. at 570-71); *Vaca*, 386

---

[14] The Union does not object to Stephens's argument in her opposition brief that its affirmative defense based on the statute of limitations has been waived. (Dkt. No. 97-6 ("Union Reply"), at 5-10; Dkt. No. 93 ("Stephens Opp."), at 9-11.) Accordingly, any such objection is deemed abandoned, and the Court declines to consider this defense. *See Carlisle Ventures, Inc. v. Banco Español de Crédito, S.A.*, 176 F.3d 601, 609 (2d Cir. 1999) (holding that, because the defendant "does not respond to [the plaintiff's] [contrary argument] in its Reply Brief," the court should "decline to consider" such a response).

U.S. at 186 ("[T]he wrongfully discharged employee may bring an action against his employer [for breach of contract pursuant to § 301] . . . , provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.").

Such a claim may be asserted against the union, the employer, or both, but, in all instances, evidence of the union's *and* the employer's respective breaches is required to satisfy the two separate elements of the claim. *DelCostello*, 462 U.S at 165; *White*, 237 F.3d at 179. In short, even if the evidence is only inadequate to prove a breach by one and not the other, the claim against *both* the union and the employer cannot prevail. *See, e.g.*, *DelCostello*, 462 U.S. at 165 ("[T]he case [the plaintiff] must prove [against the union and the employer] is the same whether he sues one, the other, or both."); *Hines*, 424 U.S. at 570-71 (holding that the plaintiff must prove both elements "[t]o prevail against *either* the company or the Union") (emphasis added); *White*, 237 F.3d at 183 (holding that, for hybrid § 301/DFR claims requiring "proof of violations by both the union and the employer," "plaintiffs' failure to establish their DFR claim against the union means that their . . . claim against [the employer] necessarily fails as well").

In this case, the Court considers whether there is enough evidence to demonstrate at trial that the Union breached its DFR by declining to arbitrate the Employer's alleged breaches of the collective bargaining and settlement agreements.[15] Upon finding that such evidence is lacking, the Court dismisses the hybrid § 301/DFR claims against the Union *and* the Employer, without also considering the Employer's breaches.[16]

---

[15] The Court, in its consideration of the DFR element, assumes for the sake of argument that the Employer *did* breach the two agreements.

[16] In the opening of her opposition brief, Stephens argues that the Employer only "claims" that the DFR element is a "prerequisite to maintaining this action" against it. (Stephens Opp., at

1. Breach of the Union's DFR

To establish the DFR element of a hybrid § 301/DFR claim, the plaintiff must prove that (i) the union's "conduct" with respect to her was "arbitrary, discriminatory, or in bad faith," and (ii) such wrongful conduct caused her injuries. *White*, 237 F.3d at 179; *see also Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 126 (2d Cir. 1998) (same), *cert. denied*, 526 U.S. 1017 (1999).[17]

The "arbitrary" category refers to conduct that is "so far outside a wide range of reasonableness as to be irrational." *O'Neill*, 499 U.S. at 67, 78 (citations and quotations omitted). The "bad faith" category refers to conduct executed "with an improper intent, purpose, or motive," and "encompasses fraud, dishonesty, and other intentionally misleading conduct." *Spellacy*, 156 F.3d at 126. The "discriminatory" category—which Stephens does not argue describes the Union's conduct in this case and the Court, thus, declines to address—refers to

---

2.) Stephens does not press this argument anywhere else in the brief, nor does she provide the case law to support it. Indeed, as supported by the aforementioned case law, this argument is without merit.

[17] After *Vaca*, there is a somewhat open question of whether "perfunctory" conduct is its own separate category of wrongful conduct. 386 U.S. at 190-191 (adopting the "arbitrary, discriminatory, or in bad faith" standard for breaches of the DFR, but also holding that "a union may not arbitrarily ignore a meritorious grievance *or process it in perfunctory fashion*") (emphasis added); *compare Air Line Pilots Ass'n, Int'l v. O'Neill* ("*O'Neill*"), 499 U.S. 65, 67, 76-77 (1991) (Stevens, J.) (citing the "*tripartite* standard announced in *Vaca v. Sipes*," *i.e.*, "arbitrary, discriminatory, or in bad faith," and indicating that "we have repeatedly identified *three* components of the duty") (emphasis added), *with DelCostello*, 462 U.S. at 164 (holding that *Vaca* and *Hines* recognized that "discriminatory, dishonest, arbitrary, *or perfunctory*" conduct, in breach of the DFR, provides the basis for a hybrid § 301/DFR claim) (emphasis added). However, whether "perfunctory" conduct is a separate category, or a mere *sub*category of "arbitrary" conduct, does not make a meaningful difference in the Court's analysis, because such conduct is treated as *inextricably related*. *Vaca*, 386 U.S. at 194 (equating a union's *arbitrary* act of "ignor[ing] [the plaintiff's] complaint" with that of "process[ing] [her] grievance in a *perfunctory* manner," *i.e.*, without any evidence-gathering or other efforts) (emphasis added); *see also Samuels v. Air Transp. Local 504*, 992 F.2d 12, 16-17 (2d Cir. 1993) ("When a union *ignores or perfunctorily presses* a meritorious claim, it is held to have acted *arbitrarily*.") (emphasis added) (collecting cases).

13

"invidious" discrimination, *i.e.*, conduct that is "based upon impermissible or immutable classifications such as race or other constitutionally protected categories, or arises from prejudice or animus." *O'Neill*, 499 U.S. at 81; *Cooper v. TWA Airlines, LLC*, 274 F. Supp. 2d 231, 243 (E.D.N.Y. 2003); *see also White*, 237 F.3d at 180 n.7 (declining to address the "discriminatory" category, where "Plaintiffs did not allege that the leadership's actions were discriminatory").

Courts should cautiously apply this "tripartite standard," in light of the Supreme Court's hortatory language in *O'Neill*:

> *Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature.* Any substantive examination of a union's performance . . . must be *highly deferential*, recognizing the wide latitude that [unions] need for the effective performance of their bargaining responsibilities.

499 U.S. at 77-78 (emphasis added).

Given this highly deferential standard to which the union is entitled, its "tactical" decisions on how to grieve or arbitrate union members' claims, including straight-up refusals to do so, should be upheld, unless they are not merely negligent but "egregious." *Barr v. United Parcel Serv., Inc.*, 868 F.2d 36, 43 (2d Cir. 1989), *cert. denied*, 493 U.S. 975 (1989). "In hindsight, any decision a union makes in the informal yet complex process of handling its members' grievances may appear to the losing employee to have been erroneous," but "[t]actical errors are insufficient to show a breach of the duty of fair representation; even negligence on the union's part does not give rise to a breach." *Id.* Moreover, there is no "absolute right" of a union member to "compel arbitration of [her] grievance regardless of its merit." *Vaca*, 386 U.S. at 191.

Taking these principles into account, the Court now considers whether—by declining to arbitrate the Employer's termination decision, opposition to unemployment insurance benefits,

and interference with job referrals—the Union acted arbitrarily, or in bad faith, in breach of its DFR.

> i. The Termination Decision

In terms of declining to arbitrate, and, instead, settling, the Employer's termination decision, the Union's conduct was not so egregious as to be considered arbitrary, or "irrational." *O'Neill*, 499 U.S. at 67, 78. On the contrary, it was completely rational for the Union—after a "step two" grievance meeting at which its representatives both obtained information from Stephens beforehand and sat down with the Employer's representative to discuss the termination decision—to conclude that settlement, and not arbitration, would be the best course. *Supra* Section I.A.

The Union, in fact, determined that, despite Stephens's version of the events, the evidence against her, including the statement of a fellow nurse, would prove difficult to overcome, if it proceeded with arbitration. *Id.* Instead of "pursuing arbitration or litigation," which arguably presented "significant risks," the Union opted to "avoid[] the costs and risks associated with major arbitration and/or litigation." *White*, 237 F.3d at 181-82 (quotations omitted); *see also Vaca*, 386 U.S. at 191 ("Through this settlement process [between the union and the employer], frivolous grievances [of union members] are ended prior to the most costly and time-consuming step in the grievance procedures [*i.e.*, arbitration]."). By settling, the Union secured a "certain and prompt" resolution for Stephens, preferable to termination. *O'Neill*, 499 U.S. at 81.

Nor is there evidence regarding the bad faith of the Union. The only apparent "intent, purpose, or motive" that the Union had in settling, and not arbitrating, Stephens's grievance was to obtain a resolution that would not have an otherwise negative effect on her ability to find employment in the future. *Spellacy*, 156 F.3d at 126. The Union had no reason to deceive

Stephens. Indeed, with respect to Stephens's *penultimate* infraction at the nursing home, one of the same Union representatives had previously negotiated, in good faith, with the Employer for a "final warning," instead of a "termination." (Employer Ex. C.)

Contrary to Stephens's argument, the fact that the Union met only briefly with Stephens and did not otherwise investigate her case before the meeting, *and* failed to take notes during the meeting, does not evidence that it acted so perfunctorily as to establish its "bad faith, or[,] at the least[,] arbitrary conduct." (Stephens Opp., at 12-13.) The absence of note-taking by the union, and its mere conversation with the aggrieved union member, does not necessarily constitute a breach of the DFR. *Siracusa v. Am. Airlines, Inc.*, No. 99-CV-2147, 2000 WL 1810191, at *6 (N.D. Cal. Dec. 5, 2000) (Breyer, J.). In this case, the Union *did* endeavor to obtain some information from Stephens and the Employer's representative, enough to reasonably conclude that "arbitration would be fruitless" without, in effect, "ignor[ing]" Stephens's grievance by "process[ing] [it] in a perfunctory manner." *Vaca*, 386 U.S. at 194.

Accordingly, the Court finds no issue for trial as to the allegation that the Union breached its DFR by declining to arbitrate the Employer's termination decision.

      ii. Opposition to Unemployment Insurance Benefits

The Union also acted reasonably and honestly, and not arbitrarily or in bad faith, in declining to arbitrate the Employer's opposition to unemployment insurance benefits, which Stephens received, albeit retroactively. *See O'Neill*, 499 U.S. at 67, 78 (defining "arbitrary"); *Spellacy*, 156 F.3d at 126 (defining "bad faith"). At best, the Union's choice not to arbitrate was a "tactical" one that Stephens now challenges without a sufficient basis. *Barr*, 868 F.2d at 43.

Upon finding out from Stephens about the Employer's opposition to her benefits claim, the Union called the Employer's representative, who agreed to, and eventually did, withdraw, or ask Budget to withdraw, the appeal from the ALJ's decision to award her benefits. *Supra*

Section I.B. The Union—having "diligently" removed any opposition to the awarding of such benefits by the ALJ—had every reason to conclude that further arbitration would be "fruitless," because it would have achieved the same result. *Vaca*, 386 U.S. at 193-94; *supra* Section I.B. In short, there was nothing to arbitrate. Meaningless arbitration would have been wasteful, particularly since this "step in the grievance procedures" is considered to be the "most costly and time-consuming." *Vaca*, 386 U.S. at 191. Given that the Union made good-faith efforts to address the Employer's opposition to Stephens's receipt of unemployment insurance benefits, and believed that there was no other reason to arbitrate after its efforts had succeeded, nothing but speculation would suggest that the Union was also engaged in "fraud, dishonesty, and other intentionally misleading conduct." *Spellacy*, 156 F.3d at 126. Indeed, Stephens offers no evidence to support such a claim.

Stephens argues that the *retroactive* awarding of unemployment insurance benefits, after the Employer withdrew the appeal, did not compensate her for other "hardships" that she suffered in the interim, *e.g.*, unpaid bills, which arbitration would have allegedly resolved. (Stephens Opp., at 16; Stephens Ex. 9, at 191:12-192:23.) This argument is unavailing: there is no dispute that the Union had *a* basis for declining to arbitrate, *i.e.*, it did not believe that arbitration would accomplish anything more than securing for Stephens her improperly-opposed unemployment insurance benefits, which it had already accomplished. Even if that reasoning was erroneous, a proposition for which Stephens provides no support, such "errors" in the Union's strategy, even negligent ones, are "insufficient to show [its] breach of the duty of fair representation." *Barr*, 868 F.2d at 43.

Accordingly, the Court finds no issue for trial as to the allegation that the Union breached its DFR by declining to arbitrate the Employer's opposition to unemployment insurance benefits.

### iii. Interference with Job Referrals

The Union also did not breach its DFR by declining to arbitrate the Employer's interference with Stephens's ability to obtain job referrals from the Employment Center. As with its choice not to arbitrate the Employer's opposition to unemployment insurance benefits, the Union reasonably chose not to arbitrate the job referral issue, because it concluded, after speaking to a representative from the Employment Center, that such arbitration would be "fruitless." *Vaca*, 386 U.S. at 194.

Based on Labrise's representation to McCarthy regarding the Employment Center's decision not to refer Stephens, the Union was aware that there was at least one sufficient reason for the decision, unrelated to the Employer's negative reference to Stephens's termination. Thus, the Union had a basis for concluding that it would have been futile to initiate arbitration over the non-referral. *Supra* Section I.C. Given the existence of this other sufficient ground for the non-referral, it was reasonable for the Union to believe that arbitrating the Employer's reference to the termination as a breach of the settlement agreement would *not* have changed the Employment Center's decision. At best, Stephens challenges an alleged "tactical error," but not one that reflects the absence of clear reasoning by the Union in refusing to arbitrate this issue. *Barr*, 868 F.2d at 43. Furthermore, there is no evidence, or even a suggestion, that the Union's non-arbitration determination reflected any intent to defraud, lie, or otherwise mislead. *Spellacy*, 156 F.3d at 126. Lastly, Stephens's argument—that, even if arbitration of the Employer's interference would not compel *the Employment Center* to refer Stephens, it would at least compel *the Employer* to reinstate her (Stephens Opp., at 15)—is purely speculative, and lacks any evidentiary support.

Accordingly, the Court finds no issue for trial as to the allegation that the Union breached its DFR by declining to arbitrate the Employer's interference with job referrals.[18] Because Stephens has failed to demonstrate that she is able to overcome at trial the "highly deferential" standard of establishing the DFR element, her hybrid § 301/DFR claims should be dismissed. *O'Neill*, 499 U.S. at 78.

III. Conclusion

The Court, therefore, GRANTS Defendants' summary judgment motions, and DISMISSES *with* prejudice all of the hybrid § 301/DFR claims that Stephens asserts. The Clerk of the Court is directed to enter judgment accordingly, and close this case.

SO ORDERED:

/s/ Pamela K. Chen
PAMELA K. CHEN
United States District Judge

Dated: September 23, 2014
Brooklyn, New York

---

[18] While it may seem harsh that Stephens's claims must be dismissed, notwithstanding the Employer's apparent breaches of the settlement agreement, given the arbitration and grievance process to which Stephens agreed as a Union member, the only way that she can directly litigate her claims against the Employer, without first going through this process, is if the Union has breached its DFR in declining to arbitrate these claims. Because of the policy interest in having the unions represent their members in disputes against employers, the DFR doctrine preserves the unions' latitude in making strategic decisions regarding whether to commence an arbitration or grievance, and, thus, serves as a presumptive bar against the litigation of hybrid § 301/DFR claims, in cases where the unions have exercised their prerogative not to arbitrate or grieve particular disputes.